IN THE UNITED STATES DISTRICT COURT FILED
DISTRICT OF CONNECTICUT

---------------------------------------------------------X

MADISON POLYMERIC ENGINEERING,        :        2004 AUG -9  A 11: 28
INC., WALTER L. MAGUIRE, JR., in their        :
individual capacity and derivatively as a        :        U.S. DISTRICT COURT
member(s) of Horticultural Technologies,        :        HARTFORD, CT.
L.L.C.,        :

                    Plaintiffs,        :

        -against-        :        Civil Action No.: 3:00CV2290(RNC)

WAYNE CASTLEBERRY and        :
HORTICULTURAL TECHNOLOGIES,        :
L.L.C.,        :
        :        August 6, 2004
                    Defendants.        :
        :
---------------------------------------------------------X

## MEMORANDUM OF LAW

The plaintiffs Madison Polymeric Engineering, Inc. ("Madison") and Walter L. Maguire

("Maguire"), by their counsel, Neubert, Pepe & Monteith, P.C., respectfully submit this

Memorandum of Law in opposition to defendants' Motion to Enforce Settlement Agreement.

### Preliminary Statement

This case concerns a shareholder dispute between two the plaintiffs, the 66 and 2/3

percent owners of Horticultural Technologies, LLC ("HTL") and Wayne Castleberry

("Castleberry"), the 33 and 1/3 percent owner of HTL.  The Company had two main products,

the Transporter line, and the Medius product, which was still under development when the

litigation started.

It is ironic that two years after the August, 2002 settlement conference that defendants

now seek to enforce the alleged settlement agreement (the "Preliminary Agreement") after it has

become abundantly clear that defendant Wayne Castleberry repeatedly testified falsely under oath about the Medius product in an attempt to conceal the fact that he transferred the Medius intellectual property and all information concerning Medius to his new business partners at CP Medius, LLC. It is ironic that Castleberry that now seeks to enforce the Preliminary Agreement since plaintiffs finally obtained possession of thousands of pages of responsive documents demonstrating Castleberry's wrongful acts which he stored with his new business partners in North Carolina. It is ironic that Castleberry now seeks to enforce the Preliminary Agreement when these documents demonstrate that many of the expenses incurred by HTL were for Castleberry's personal lifestyle and that HTL funds were used to pay for transferring and exploiting the Medius product on behalf of CP Medius, LLC. Collectively, it is ironic that Castleberry would ask this Court to enforce a Preliminary Agreement, given such extreme bad faith and violation of the rules of the discovery process, when a final Settlement Agreement was never executed, Castleberry's subsequent acts have rescinded the Preliminary Agreement or rendered a novation, and Castleberry cannot and has not performed conditions precedent to plaintiff's performance under the Agreement. Castleberry should not be rewarded for misleading the plaintiffs, testifying falsely under oath, and withholding responsive, highly relevant documents. Defendants' Motion should therefore be denied.

**Statement of Facts**

In or about the winter of 1998, Maguire purchased membership units in HTL from Castleberry's two former partners. ¶10-11, Complaint. The purchase was made pursuant to an agreement signed by both Castleberry and Maguire. In summary, the agreement provided that Maguire and/or Madison would (1) become the majority (66.66% ) shareholder in HTL by purchasing the membership units of all members other than Castleberry; (2) become the exclusive manufacturer of HTL products; (3) be compensated for such manufacturing services at the rate of Madison's cost plus 20%; and (4) would provide HTL with a certain amount of working capital. Castleberry remained the chief executive officer of HTL and retained physical control of the Company. ¶9, Complaint.

**Medius Was A Key HTL Product From The Beginning**

Since its inception in, HTL had two distinct types of products it developed and/or marketed to the public: devices which were used to transport flowers and plants (the Transporter 10 products) and Medius, a foam growing media for flowers and vegetables. See Exhibit 1, Allentuch Declaration. Castleberry prepared a "Business Plan/Financial Proposal" dated August, 1998, which he gave to plaintiffs to induce them to purchase the membership interests in HTL of Castleberry's current partners. Id.

One section of the Business Plan contains a lengthy description of Medius products stating: "Medius is a growing media that will be used in the floral and vegetable industries. Horticultural Technologies, L.L.C. proposes that Medius will capture a significant part of these markets." The Business Plan also contained a section analyzing "Competition" for Medius products and a marketing plan. Finally, the Business Plan also included color pictures from the Medius growth trials conducted at North Carolina State University performed in connection with

3

General Foam Corporation. Maguire was subsequently provided with a copy of the North Carolina State University Report. See Exhibit 2, Allentuch Declaration. The plaintiffs and the defendants even agreed upon a budget which had a line item for costs associated with the Medius product. See Exhibit 3, Allentuch Declaration. At his November 1, 2001 deposition, Maguire testified that: "I wanted to use that particular money for the Medius project. It was the major part of this company's potential." P. 28, Exhibit 13, Allentuch Declaration. Maguire continued: "[i]t was my intention for the company to sell these transporters until it could really develop the Medius product line, which was the large potential of this company." P. 34, Exhibit 13, Allentuch Declaration.

Castleberry was deposed on November 6, 2001. See Exhibit 4, Allentuch Declaration. At his deposition, he testified that HTL was developing Medius and that it was a "potentially bigger moneymaker for the company than" its other products. Pp 140-141, Castleberry Deposition, Exhibit 4, Allentuch Declaration. In response to the question whether "it was [HTL's] intent in December of 1998 to manufacture a Medius product in 1999," Castleberry responded, "[y]es." He also testified that HTL had the rights to Medius. P. 142, Castleberry Deposition, Exhibit 4, Allentuch Declaration. The Medius name was trademarked (serial number 75481245) and HTL owned the trademark. Exhibit 14, Allentuch Declaration.

**Castleberry Secretly Appropriated the Medius Product**

In or about October, 2001, Castleberry's business partners, Mark, Keith and Jon Pavlansky (the "Pavlanskys"), created an entity known as CP Medius LLC ("CP Medius"). See Exhibit 7, Allentuch Declaration. Just before the August, 2002 Settlement Conference, Castleberry transferred the Medius Trademark from HTL to CP Medius. See Exhibit 14, Allentuch Declaration. Castleberry had HTL pay for at least part of the costs associated with

transferring and maintaining this trademark for CP Medius. Castleberry secretly caused HTL to pay the Pavlanskys' attorneys, Brock, Scott, & Ingersoll, PLLC, for the formation and other legal expenses associated with CP Medius. Exhibit 15, Allentuch Declaration. Castleberry also caused HTL to pay for the design of CP Medius' new "Medius" logo in January, 2002. Exhibit 16, Allentuch Declaration. Castleberry had HTL pay for CP Medius packaging design and web hosting. These also occurred during the first seven months of 2002. Exhibit 17, Allentuch Declaration. All of these documents were recently recovered from the Pavlanskys after a drawn out discovery battle in North Carolina. In sum, since Castleberry controlled HTL and had frozen Maguire out, he used HTL assets to pay for stealing and transferring the Medius product, and related intellectual property, to CP Medius.

None of the forgoing was disclosed by Castleberry in deposition or in documents to Maguire, during the litigation or outside the litigation. Paragraph 19, Allentuch Declaration.

### Castleberry Testified Falsely and Failed to Produce Documents Which Would Have Exposed His Scheme

At Castleberry's deposition in November 6, 2001, Castleberry then testified that he had nothing to do with Medius any longer. He testified:

> Q.    And have you done anything with them since December, 1999?
>
> A.    **I have nothing to do with Medius any longer.**

(emphasis added) P. 142, Castleberry Deposition, Exhibit 4, Allentuch Declaration. Castleberry then testified as follows:

> Q.    Okay. So you have basically given up on producing Medius products at this point?
>
> A.    **Yes I have.**

(emphasis added).  P. 144, Castleberry Deposition, Exhibit 4, Allentuch Declaration.  Given his

activities on behalf of CP Medius in 2001 and 2002, this statement was clearly false.         In

response to a question whether he had manufactured the Medius product, Castleberry responded

"No."  He continued: "Because at this point, I was too busy discovering other flaws in the

relationship with Madison Polymeric Engineering that was involved with the transporter delivery

system that I needed to handle first before getting involved with Medius . . ." P. 141, Exhibit 4,

Allentuch Declaration.  That statement was clearly false since he was in the process of taking the

Medius product and transferring it to CP Medius.

        Mark Pavlansky, President of Hibco Plastics, Inc., also testified falsely at his deposition

on the same issue.  The deposition was held on November 16, 2001, only months after CP

Medius, LLC was created.  Mark Pavlansky testified:

> Q.      Other than your relationship with HTL, do you have
> any other type of relationship with Wayne Castleberry?
>
> A.      **No.**
>
> Q.      So the only thing that Hibco Plastics does for
> Castleberry or HTL is to produce the items in Pavlansky 1
> [Transporter 10 products.]
>
> A.      **Exactly.**

(emphasis added).  P. 22, Pavlansky deposition, Exhibit 10, Allentuch Declaration.  Mark

Pavlansky testified further that:

> Q.      Has Castleberry asked you or Hibco to invest in any
> other venture?
>
> A.      **No.**
>
> Q.      **Are you familiar with the word medius?**
>
> A.      **No.**

6

P. 26, Pavlansky Deposition, Exhibit 10, Allentuch Declaration. Mark Pavlansky's counsel at the 2001 deposition, Mark Ingersoll, was the same attorney who had just incorporated CP Medius, LLC for the Pavlanskys. See Exhibit 16, Allentuch Declaration. When plaintiffs redeposed Mr. Pavlansky last month, he denied having been asked the question and claimed the transcript was incorrect. He admitted however, that the answer to the question above should have been "yes." P. 147, Exhibit 18, Allentuch Declaration.

In addition, the plaintiffs served the defendants with document demands. Among the demands which clearly would have required Castleberry to produce documents concerning Medius was request 44, which asks for "[a]ll documents concerning Mobius or Medius." See Exhibit 11, Allentuch Declaration. While no objection was interposed, the defendants did not produce any documents concerning CP Medius, LLC or its products. Instead, he testified: "I provided you with everything you requested." P. 195, Exhibit 4, Allentuch Declaration. There is a Motion to Compel Production now pending in this case because it is apparent, with respect to a large number of requests, that Castleberry purposely failed to produce documents.

Similarly, Mark Pavlansky and Hibco, Inc. were subpoenaed to produce documents in November, 2001. See Exhibit 12, Allentuch Declaration. Among other documents, Mark Pavlansky and Hibco were asked to produce "all documents concerning HTL or Castleberry;" "all contracts or agreements with HTL or Castleberry;" "all correspondence to or from HTL or Castleberry;" and "all e-mails sent to or received from HTL or Castleberry." They failed to produce any documents concerning Medius or CP Medius. Id.

**Discovery of Castleberry's Wrongdoing**

During January, 2003, defendants' counsel forwarded an e-mail from his client with a comment concerning an outstanding bill for the HTL website. Castleberry's e-mail bore the return e-mail address wcastle@cpmedius.com and the website www.cpmedius.com. According to the website, CP Medius' primary product is called Medius, the same name HTL used for the foam based growing medium it was developing. See Exhibit 6, Allentuch Declaration. According to the website, "Medius is a homogenous horticultural foam material, which is designed to give the grower a consistent and cohesive growing medium. The Growing Medium is completely sterile, has neutral PH and exhibits uniform hydrology." Id. Medius is similarly described in the 1998 HTL Confidential Business Plan as follows: "Medius is a growing media that will be used in the floral and vegetable industries. Horticultural Technologies, LLC proposes that Medius capture a significant part of these markets. The structure of the foam growing media involves expansion of polyurethane . . . . It is sterile." See Exhibit 1, Allentuch Declaration. The CP Medius website showcases the same 1999 North Carolina State University report on Medius which is contained in the HTL Confidential Business Plan that Castleberry gave to Maguire. See Exhibits 1 and 6, Allentuch Declaration. The Business Plan states: "physical and chemical characteristic tests were conducted at the Horticultural Substrate Laboratory, at North Carolina State University. Rooting trials were conducted next in the greenhouse and growth tests were conducted next in the greenhouse and growth tests will conclude." See Exhibit 1, Allentuch Declaration. The study used by CP Medius and cited on its website is the same study which was prepared for HTL.

The headquarters for CP Medius is located at the address for Hibco Plastics in North Carolina. See Exhibit 6, Allentuch Declaration. When Castleberry froze plaintiffs out of HTL,

Hibco produced all of HTL's products. Castleberry is listed as the contact person for Customer Service & Sales in the United States. Jon Pavlansky is also listed as a CP Medius executive on its website. According to Hibco Plastic's website, Mark, Keith, and Jon Pavlansky, manage Hibco. Id.

**The Preliminary Agreement**

In August, 2002, the parties met with Special Master Lynch and entered into an agreement to agree (the "Preliminary Agreement") (Exhibit 5, Allentuch Declaration) which set forth the general terms of the settlement. Pursuant to the Preliminary Agreement, Castleberry was required to transfer all of the rights to the intellectual property of HTL to Maguire/Madison in exchange for the settlement of all of the plaintiffs' claims against them. The Preliminary Agreement also provides that the parties would enter into a formal settlement agreement (the "Formal Settlement Agreement").

**Subsequent Settlement Discussions and Discovery**

In or about June, 2004, the parties met with Magistrate Margolis for a settlement conference. The parties reached a new settlement in principle. The tentative settlement is contingent, in part, on Castleberry's ability to raise funds to pay plaintiffs.

Since that time, defendant, at great expense and difficulty, attempted to CP Medius, LLC and Hibco Plastics Inc. CP Medius and Hibco failed to comply with a duly served subpoena. After an extended discovery battle, Mark Pavlansky appeared for Hibco and subsequently produced documents. These documents, some of which were discussed above, demonstrate that Castleberry used thousands and thousands of dollars of HTL funds to pay for his personal lifestyle, including purchases at Circuit City, trips to Canada for his other business and restaurants near his house to name a few. See Paragraph 19, Allentuch Declaration. As briefly

discussed above, Castleberry used HTL money to pay for the creation of CP Medius and the

transfer of intellectual property from HTL to CP Medius.

**Castleberry Spent Huge Sums of HTL Money on Himself and Concealed It**

In the documents plaintiffs obtained last month in North Carolina from Castleberry's

business partner, the Pavlanskys, documents demonstrate that Castleberry paid for many of his

personal expenses with HTL's funds. See Exhibit 22, Allentuch Declaration.  While simply

examples, the documents show that Castleberry charged and HTL paid for home electronics,

picture frames, multiple restaurants near his home, haircuts, dry cleaning bills, YMCA

membership, home improvement supplies, AAA membership, purchases at gift stores, postage

for personal shipping, groceries, personal items from Walmart, Barry Mantilow tickets,

Consumer Reports subscription, whole life insurance, other life insurance, and liability insurance

for CP Medius, LLC dating back to the beginning of 2002. See Exhibit 22, Allentuch

Declaration. Castleberry did not reimburse HTL for any of these items.

**Castleberry Continues To Testify Falsely Under Oath**

Castleberry was redeposed on May 26, 2004. While there are many statements he made

in his deposition which are false, his testimony with respect to CP Medius is clearly not true.  In

response to the question "So when did you start working for CP Medius?", Castleberry

responded "September 2002 or sometime in 2003." P. 263, Exhibit 19, Allentuch Declaration.

He continued that he "asked them could he be hired and they said sure." Id.  Presumably,

Castleberry selected September, 2002, because it was the month following the settlement

conference.  Of course, documents which Castleberry maintained in North Carolina which

plaintiffs obtained last month with great difficulty, demonstrate that he was involved with CP

Medius as early as the end of 2001 and the beginning of 2002. See Exhibits 16 through 18,

Allentuch Declaration. Castleberry's wife, is listed as the administrative contact for the cpmedius.com website which was created in October, 2001. See Exhibit 9, Allentuch Declaration.

**Argument**

## I.    The Preliminary Settlement Was Procured By Fraud and Is Unenforceable

Castleberry repeatedly testified falsely and failed to produce responsive documents in order to induce plaintiffs to settle. Defendants conveniently ignore substantially all of the facts set forth in the Statement of Facts above. It is black letter law in Connecticut that an agreement procured by fraud is not enforceable. "A party to a contract other than an automobile insurance contract may rescind that contract and avoid liability thereunder if that party's consent to the contract was procured either by the other party's fraudulent misrepresentations, or by the other party's nonfraudulent material misrepresentations." Munroe v. Great Am. Ins. Co., 234 Conn. 182, 188 n.4, 661 A.2d 581 (1995). The Second Circuit Court of Appeals reached the same conclusion when it found that "a settlement contract or agreement, like any other, may be attacked on grounds that it was procured by fraud," First National Bank of Cincinnati v. Pepper, 454 F.2d 626, 632 (2d Cir. 1972) See also, Rothenberg v. Kamen, 735 F.2d 753, 754 (2d Cir. 1984)(Where defendant's may have made fraudulent statements and plaintiff relied, settlement agreement is unenforceable.).

Here, as stated in Walter Maguire's Affidavit, plaintiffs were induced to settle because they thought they were getting the intellectual property associated with Medius and could exploit that property. ¶3, Exhibit 20, Allentuch Declaration. The Preliminary Agreement provides that plaintiffs were to receive all of the intellectual property of HTL. See P. 2, Joint Settlement Memorandum (attached to defendant's moving papers). In fact, Castleberry had secretly

11

transferred the intellectual property to CP Medius shortly before the settlement discussions.  See

Exhibit 14, Allentuch Declaration.

As outlined in great detail in the Statement of Facts, in November, 2001, Castleberry

testified that he had **nothing to do with Medius any longer."** (emphasis added) P. 142,

Castleberry Deposition, Exhibit 4, Allentuch Declaration.  That testimony was false.  Pavlansky

testified that he was not "familiar" with the word "Medius."  P. 26, Pavlansky Deposition,

Exhibit 10, Allentuch Declaration.  That testimony was false.  Castleberry never produced

documents concerning Medius. Approximately two months before their depositions, CP Medius

was formed.  At his second deposition, Mark Pavlansky testified that he "did not know" what the

"CP" in CP Medius meant.  P.123, Exhibit 20. Allentuch Declaration.  Of course the logical

meaning of the initials "CP" in CP Medius is 'Castleberry Pavlansky,' since those are the parties

involved.  In addition, it is clear that Castleberry's wife, reserved the domain name and became

the administrative contact for CP Medius.com in October, 2002. See Exhibit 9, Allentuch

Declaration.

In addition to his failure to produce documents demonstrating his involvement with CP

Medius and the Pavlanskys, as well as documents which demonstrate that he was using HTL to

pay for his own personal expenses while paying the majority shareholder (plaintiffs) nothing,

Castleberry made other material misrepresentations.   Castleberry also represented that the Floral

Container Carrier was a product he developed on his personal time and was not the property of

HTL.  P. 2, fn1, Joint Settlement Memorandum (attached to defendant's moving papers).  In fact,

HTL paid for the costs associated with developing this product and marketing it.  Exhibits 21,

Allentuch Declaration.  As a result of this misrepresentation, plaintiffs agreed to pay Castleberry

$17,500.00 as part of the settlement.  P. 3, Joint Settlement Memorandum (attached to defendant's moving papers).  This was a material term of the settlement.

In the defendants' Memorandum of Law in Support, it makes a series of factual claims about what plaintiffs knew and when they knew it.  See e.g., p. 7, Def. Memorandum of Law.  Defendants provide no documents to support their claims, no deposition testimony and no affidavits.  They do not address plaintiffs' contention that Castleberry and Pavlansky repeatedly testified falsely under oath and failed to produce documents.  Instead, they supply case law stating that a settlement agreement is a binding contract.  As a general proposition that is correct.  However, defendants ignore the fact that a contract procured through fraud and material misstatements is not binding.  Accordingly, the Preliminary Agreement is not binding and defendants' Motion must be denied.

## II.    The Preliminary Agreement Was Mutually Rescinded

Defendants neglect to mention that the parties have entered into subsequent discussions with Magistrate Margolis and have reached a new tentative agreement.  By engaging in additional settlement discussions, and continuing to litigate this case during the past two years, defendants mutually rescinded the Preliminary Agreement.  In Lachappelle v. Southford Park, 1994 Conn. Super. LEXIS 962, *2-*3, where the parties reached a tentative settlement and one party rescinded, the Court found the parties had mutually rescinded because "the defendants' continuation to file pleadings in this case after the plaintiff 'changed her mind' about the settlement agreement indicates that the parties mutually assented to a rescission of the settlement agreement."  Similarly, the Restatement of Contracts contains the same analysis: ". . . if either party even wrongfully expresses a wish or intention to abandon performance of the contract, and the other party fails to object, there may be sometimes circumstances justifying the inference that

he assents. If so there is rescission by mutual assent. . . . Sometimes even circumstances of a negative character, such as the failure by both parties to take any steps looking towards the enforcement or performance of a contract, may amount to a manifestation of mutual assent to rescind it." Restatement, 2 Contracts, § 406, comment b

The same analysis applies here. After the parties reached a Preliminary Agreement in August, 2002, the plaintiffs made it clear orally and in pleadings that the Preliminary Agreement was null and void because of Castleberry's false statements under oath and failure to produce documents which demonstrated his wrongful acts. Defendants continued to litigate the case by filing and opposing motions, taking and defending depositions, attending new settlement conferences, reaching a new tentative settlement and responding to documents requests, among other items. Now, almost two years after the Preliminary Agreement was reached, defendants are seeking to enforce the document. By their actions, the parties mutually rescinded the preliminary agreement.

## III.    The New Tentative Settlement Agreement Is A Novation

Even if the Preliminary Agreement was binding, it was superceded by the new tentative settlement agreement. The new settlement works a novation because it is an agreement for "an existing obligation to be extinguished immediately by the acceptance of a new promise." May Dep't Stores Co. v. International Leasing Corp., Inc., 1 F.3d 138, 140 (2d Cir. 1993) citing National Am. Corp. v. Federal Republic of Nigeria, 448 F. Supp. 622, 643 (S.D.N.Y. 1978). Here, at the end of Magistrate Margolis' conference, among other terms, defendants tentatively promised to pay plaintiffs a significant sum of money as settlement of plaintiffs' claims. Plaintiffs tentatively agreed to give defendants a release and to discontinue this action. Given

14

this new promise, the Preliminary Agreement, to the extent enforceable, was clearly

extinguished.  The Preliminary Agreement is therefore not enforceable.

## IV.    The Preliminary Agreement is An Agreement to Agree and is Not Enforceable

Agreements to agree are not enforceable under Connecticut law.  "The general rule is that

an agreement to agree is too indefinite to be legally binding when it requires a superseding

contract the terms of which must be negotiated." Srager and Srager v. Koenig, 1999 Conn.

Super. LEXIS 662; see also Fowler v. Weiss, 15 Conn. App. 690, 693-94, 546 A.2d 321; Lizotte

v. Enfield, 1999 Conn. Super. LEXIS 2383.  The first paragraph specifies that the attorneys will

draft a formal written settlement agreement.  P. 1, Joint Settlement Agreement (Copy Attached to

Def. Moving Papers).  While the Preliminary Agreement states that it contained "all terms"

settling this litigation, the formal settlement agreement was significantly longer adding additional

terms. By its very terms, the Preliminary Agreement is an agreement to agree and is therefore

not enforceable.

## V.    Defendants Failed To Satisfy A Condition Precedent
## To Enforce The Preliminary Agreement

Defendants have not performed any of their obligations under the agreement and are

therefore in breach of the Preliminary Agreement.  Among others, paragraph 6 of the Preliminary

Agreement states that:

> [t]he payment of the $17,500.00 is expressly contingent on the
> defendants providing the plaintiffs with satisfactory evidence that
> they incurred costs in developing and patenting the Floral
> Container in the minimum amount of $23,000.00.  The Settlement
> Agreement is conditioned on the production of such evidence.

P. 3, Joint Settlement Memorandum (Attached to Def. Memo of Law).  Castleberry never

produced such evidence. As discussed above, Castleberry represented that he had paid for the

15

Floral Container himself and that it was his product. Id. at p. 2, fn 1. In the documents obtained from a third party last month, it appears that HTL paid at least some of these expenses. Therefore, it is highly unlikely that Castleberry can prove that he paid for these expenses as required by the Preliminary Agreement. Since the Preliminary Agreement is "conditioned on the production of such evidence" and defendants cannot and have not made such production, plaintiffs' obligation to perform has not an cannot mature. Accordingly, defendants' Motion should be denied.

## Conclusion

For the reasons set forth above, plaintiffs respectfully request that the Court deny

defendants' Motion to Enforce Settlement Agreement.

THE PLAINTIFFS

By: _____
Simon I. Allentuch, Esq.
Neubert, Pepe & Monteith, P.C.
195 Church Street, 13th Floor
New Haven, CT 06510
Tel (203) 821-2000
Fed. Bar No. ct21094

## CERTIFCATION OF SERVICE

I hereby certify that a copy of the foregoing was sent via first class, postage prepaid on August 9, 2004 to:

Thomas Bucci, Esq
Willinger, Willinger & Bucci
855 Main Street
Bridgeport, CT 06604

Simon I. Allentuch